STATE *ex rel. v.* SOUTHERN JUNIOR COLLEGE.

(*Knoxville,* September Term, 1933.)

Opinion filed Nov. 18, 1933.

536

Sizer, Chambliss & Kefauver, for State *ex rel.*

Wilkerson & Wilkerson, for Southern Junior College.

Mr. Chief Justice Green delivered the opinion of the Court.

This suit was brought in the name of the State on the relation of a number of citizens of Chattanooga, engaged in the printing business, to enjoin the defendant, an incorporated educational institution, from carrying on the business of commercial printing. Defenses were interposed, proof taken, and upon the hearing the chancellor granted the relief sought. The proceeding being one in the nature of a *quo warranto* suit, defendant took an appeal directly to this court.

There is no particular controversy as to the facts. Defendant school was chartered in 1919 as a corporation for the general welfare, not for profit, under the laws of Tennessee. It is operated under the auspices of the Southern Conferences of the Seventh Day Adventists. The institution owns seven hundred acres of land in Hamilton county, upon which tract its buildings are located. A model farm and dairy is there conducted. Its buildings, dormitories, teachers' houses, and other equipment represent an investment of some $350,000. Prac-

tically all its assets have been derived from contributions from the conferences of the denomination mentioned.

The defendant institution undertakes to afford means of education to young people of limited means or to those without means. While the bulk of its students are of the Seventh Day Adventist faith, the school is open to students of any belief. The institution affords academic education and also instruction in training and in applied arts and occupations. In pursuit of the latter effort, the school maintains, or has maintained, not only its farm and dairy, but a bakery, a broom factory, a hosiery mill, a general store, an insurance agency, a printing shop, and other industries. The purpose is to instruct students in such lines of work, to give them practical experience, but also to make these different enterprises self-sustaining, and, if possible to procure from such operations a profit for the general support of the school. Students are employed to work in all these undertakings, and they are paid largely by receiving credit on their board and tuition for services rendered by them as aforesaid.

One of the courses afforded by defendant school in its catalogue is a course in printing. Regular instructors teach that course as they would any other course. In addition, the school owns and operates a printing shop; its equipment consisting of a large cylinder press, a small cylinder press, five job presses, stitchers, and other things appurtenant to a printing shop. About $21,000 has been invested in such equipment. Two experienced printers are employed as foremen, and students, taking the printing course, do the other work in this shop, for which they receive compensation as outlined above.

Part of the work done in this shop is printing defend-

ant's own catalogues and advertising matter and printing the religious literature of the several conferences of the Seventh Day Adventists in the Southern States. In 1932 the business of this printing shop amounted to $28,522.81. Of this amount $17,842.04, or sixty-two and one-half per cent of the whole, was commercial printing; $7,650.86 was commercial work done in Chattanooga by defendant's printing shop in actual competition with the relators. Most of the work was procured from business houses in Chattanooga, from whom the defendant school purchased supplies. There was a total profit of $5,283.86 on the operation of the printing shop in 1932. All of this profit was applied to the general purposes of the school.

The general purposes for which the defendant school was incorporated are stated in its charter as follows:

"For the support of public worship, the building and maintenance of churches, parsonages, schools, hospitals, chapels, and such other religious, educational or benevolent institutions as may be necessary or proper to the work of missionary bodies in the United States, or in any foreign country, and the maintenance of all missionary undertakings; also for the support of any literary or scientific undertaking—as a college or university, with powers to confer degrees; an academy, a debating society, lyceum, the establishment of a library, the support of an historic society, the promotion of painting, music, or the fine arts, or other objects of like nature."

The particular purposes are thus stated:

"The particular purpose for which this charter is sought is to establish and maintain a college in which the Bible, languages, industrial training, mathematics, history, sciences and other studies necessary to the train-

ing of ministers of the Gospel and missionaries in foreign and home fields, Bible teachers, colporteurs and Christian workers in various lines of religious, benevolent and philanthropical work shall be taught, and in which the theological school shall be established and maintained.''

Among other limitations upon the powers of the defendant, the charter contains this language:

''The means, assets, income or other property of the corporation shall not be employed directly or indirectly for any other purpose whatever than to accomplish the legitimate objects of its creation, and by no implication shall it possess the power to . . . buy or sell products or engage in any kind of trading operation, nor hold any more real estate than is necessary for its legitimate business.''

The chancellor expressed the opinion that there was obviously no express power conferred upon the defendant by its charter to operate a commercial printing shop, and that no such authority could be implied from the powers granted, since the carrying on of the business of commercial printing had no reasonable relation to the conduct of the school. The chancellor further thought that the charter denial of power on the part of the corporation ''to buy or sell products or engage in any kind of trading operation'' was an express prohibition against the conduct of a commercial printing shop by it.

These conclusions seem to us to be unavoidable. Instead of being an incident, the commercial feature absorbed the greater part of the activities of this printing shop. Without doubt the defendant school was entitled to own a printer's outfit and to use that outfit in giving practical instructions to the students in this art. The institution, however, had no authority to employ this

540

equipment commercially in the printing trade, and the chancellor properly so held.

Lincoln Memorial University, having an excess water supply which it desired to sell to nearby consumers, found it necessary to obtain an amendment to the general corporation laws authorizing educational corporations to acquire, construct and maintain a waterworks system, and to sell the excess of water, not needed for the school, provided the revenues from such sale were devoted to the purposes for which the corporation was organized. See chapter 12 of the Public Acts of 1915 and *Lincoln Memorial University* v. *Sutton*, 163 Tenn., 298, 43 S. W. (2d), 195.

We are satisfied that the defendant school here is not entitled to operate its printing shop as formerly until it obtains additional authority from the Legislature.

We are referred to *M. E. Church, South,* v. *Hinton,* 92 Tenn., 188, 21 S. W., 321, *Vanderbilt University* v. *Cheney,* 116 Tenn., 259, 94 S. W., 90, and cases following those decisions as opposed to the result herein reached. None of these cases is in point. Nothing was involved in any of them except the liability of certain charitable and educational institutions for taxation. There was no question of the charter power of any of those corporations to pursue the particular endeavor which was claimed to have secularized its efforts. In *M. E. Church, South,* v. *Hinton,* the publishing house there involved was expressly empowered to conduct a printing business. In *Vanderbilt University* v. *Cheney,* the charter power of the university to own the office building and apartment house was not challenged. So with the other cases.

It is urged by the defendant that a bill, such as the one here filed, cannot be brought in the name of the State

merely to restrain one activity of a corporation, but that such a bill can only be brought for forfeiture of the charter of the corporation. With this as a premise, the argument is that a forfeiture of the charter of defendant corporation will not be decreed because no public interest is involved.

We think a suit like the one before us may be brought either to enjoin a corporation from the doing of a particular thing or to procure the forfeiture of the corporation's charter, as the circumstances of the case require.

In the Code chapter regulating proceedings in the name of the State against corporations are the following sections:

"9351. When a defendant, whether a natural person or a corporation, is adjudged guilty of usurping, unlawfully holding, or exercising any office or franchise, judgment shall be rendered that such defendant be excluded from the office or franchise, and that he pay the costs.

"9352. If it be adjudged that a defendant corporation has, by neglect, nonuser, abuse, or surrender, forfeited its corporate rights, judgment will be rendered that the defendant be altogether excluded from such rights and be dissolved; and also that the corporation, its directors or managers, as the case may be, pay the costs."

Under the section first quoted, when a corporation unlawfully exercises a particular franchise, judgment shall be rendered that such corporation be excluded from the exercise of that franchise. Under the section last quoted, when a corporation is guilty of nonuser, abuse, etc., judgment will be rendered that such corporation be altogether excluded from such rights and be dissolved.

From the foregoing it seems plain that the court can, in a suit like this, exclude a corporation from pursuing

a certain endeavor, or the court can exclude such corporation altogether from pursuing any endeavor and decree a dissolution. The relief granted is to be determined by the facts of the case.

Section 9344 of the Code, under this chapter, is in these words:

"The court is authorized, upon the filing of the bill, properly verified, in all proper cases, to grant attachments and injunctions, and appoint receivers to effect the ends of justice, and to make all such orders, rules, and decrees, according to the practice of a court of chancery, as may be necessary to accomplish the objects had in view."

This section seems to afford ample authority for the injunction. The authority given to the court upon the filing of a bill to grant the writ of injunction and other writs carries the conclusion that the court has similar power after hearing the case on its merits. The statute indeed expressly authorizes "all such orders, rules, and decrees . . . as may be necessary."

It is said that by section 8 of chapter 55 of the Acts of 1846 it was expressly provided "that it shall be lawful for the Attorney General to file a bill in the nature of a bill in equity, in a court of chancery or circuit court, as hereinbefore directed, to restrain by injunction any corporation from assuming or exercising any franchise not granted," etc.; that, when the Code of 1858 was compiled, the foregoing language of section 8 of the Act of 1846 was omitted from the Code, but the remaining language of section 8 was carried into the Code. Therefore the contention is that the authority given to the Attorney General to file the bill for an injunction was abrogated by its omission from the Code.

Chancellor COOPER, one of the compilers of the Code of 1858, did not understand that any essential provision of chapter 55 of the Acts of 1846 was omitted from the Code. In *State of Tennessee ex rel. v. White's Creek Turnpike Co.*, 3 Tenn. Ch. (3 Cooper's Ch.), 163, the chancellor said the Code had condensed and readjusted this chapter to avoid repetition, but that the substance of the original act and the Code provisions was the same.

For the reasons stated, the decree of the chancellor must be affirmed.