HIGHLANDER FOLK SCHOOL et al.

*v.*

STATE ex rel. SLOAN.

(*Nashville,* December Term, 1960.)

Opinion filed April 5, 1961.

CECIL D. BRANSTETTER, GEORGE E. BARRETT, Nashville, for plaintiff in error.

A. F. SLOAN, District Attorney General, A. A. KELLY, South Pittsburg, S. P. RAULSTON, Jasper, for defendant in error.

MR. CHIEF JUSTICE PREWITT delivered the opinion of the Court.

This suit was commenced by the State through General Sloan, District Attorney General, seeking to have the charter of defendant revoked and the corporation dissolved. At a hearing as to the proposition that the school was operated for the personal and private gain of the operator, Horton, the issue was submitted to a jury and that body answered the issue in the affirmative.

There were two hearings on this matter, one in September, 1959, relative to the nuisance aspect of the petition and another one on November 3, 1959, and it was there that the Constitutional question of operating an integrated school was considered and passed upon by the trial judge.

It might be said here that the trial judge was of the opinion that the cases of *Brown v. Board of Education,* 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 and *Roy v. Brittain,* 1956, 201 Tenn. 140, 297 S.W.2d 72, had no application here because the school in question in this record is a private and not a public school.

At this hearing the Court agreed with the findings of the jury that this school was operated for the personal and private gain of Myles Horton, and that large quantities of beer were possessed and sold promiscuously to the students as well as the teachers, many of the students being minors, and these many sales of beer were all made without a license.

It is also in evidence that large stacks of beer cans, whiskey jugs and bottles were found about the school. Many exhibits appearing in the record show revolting and inexcusable conduct carried on at this school.

At many of their entertainments beer was sold without a license, and in many cases to minors. It must be borne in mind that the selling of beer without a license in Tennessee is against our criminal law and it is especially exacting as to the sale of beer to minors.

The above were the holdings of the trial judge on this quo warranto proceedings as to the nuisance feature of the case.

On the 20th day of October, 1934, Highlander Folk School was granted a general welfare charter of incorporation by the State of Tennessee, under the provisions of T.C.A. sec. 48-1101 et seq. The particular purposes for which it was incorporated were declared in its charter, Technical Record Vol. I, page 13, to be:

"The particular purposes for which this charter is sought are the support of the Highlander Folk School, adult workers education, the training of rural industrial leaders, and general academic education."

And

"The general welfare of society, not individual profit, is the object for which this charter is granted,

and hence the members are not stockholders in the legal sense of the term, and no dividends, or profits shall be divided among the members. The members may at any time voluntarily dissolve the corporation by a conveyance of its assets and profits to any other corporation holding a charter from the State for the purposes not of individual profit." T.C.A. sec. 48-1110. And

"The means, assets, income or other property of the corporation shall not be employed, directly or indirectly, for any other purpose whatever than to accomplish the legitimate object of its creation, and by no implication shall it possess the power to issue notes, or currency, deal in currency, notes, or coin, or sell products, or engage in any kind of trading operation, or hold any more real estate than is necessary for legitimate purposes." T.C.A. sec. 48-1109.

The Charter also provides:

"A violation of any of the provisions shall subject the corporation to dissolution at the instance of the State."

T.C.A. sec. 48-1109 also provides the following limitations and restrictions:

"The means, assets, income, or other property of the corporation shall not be employed, directly or indirectly, for any other purpose whatever than to accomplish the legitimate objects of its creation, and by no implication shall it engage in any kind of trading operation, nor hold any more real estate than is necessary for its legitimate purposes."

In *State ex rel. v. Southern Junior College,* 166 Tenn. 535, 64 S.W.2d 9, 11, only an injunction was there sought,

yet the Court went at length to construe the quo warranto statute with reference to its proper application and said:

"We think a suit like the one before us may be brought either to enjoin a corporation from the doing of a particular thing or to procure the forfeiture of the corporation's charter, as the circumstances of the case requires."

See *State ex inf. Otto v. Kansas City College of Medicine*, 315 Mo. 101, 285 S.W. 980, 46 A.L.R. 1472.

Summarizing the evidence in the Missouri case the Court finally stated its conclusions as follows:

"The evidence summarized above justifies the conclusion that Dr. Alexander conducted the school solely for his own private gain."

■ The proof here shows, as found by the trial jury and the trial court, that the school was operated for the private gain of Myles Horton.

The trial court as to the first questions involved, that is, did Myles Horton operate the school for his own personal gain, had this to say:

"As to the first question this court is satisfied with the verdict of the jury. The preponderance of the proof is to the effect that Myles Horton was conveyed some 70 acres of land with valuable improvements upon it by the defendant, Highlander Folk School. That he handled all the money in the school, that although Miss May Justus was the secretary and treasurer of the school, she did not write checks, or handle the money, or any of the finances of the school. The President, Myles Horton handled the finances of the defendant. He wrote all the checks; or designated some one when

he was away to write the checks. He reared a family on defendant's property and all the expenses of taking care of himself and family and household servants, throughout some 25 years were paid out of defendant's funds.''

Horton testified that during the first years of the school he put everything into the building of the school with the idea of getting it out of the school at some later date.

Horton testified that for the past few years he had been drawing a salary of some $9,000 annually. However, he was unable to produce any record of the directors or executive committee having fixed his salary. The inference is that he fixes his own salary.

There isn't any proof that the governing officers of defendant, school, have ever protested any of the acts of Horton in this illegal operation of the school.

The charter of defendant provides:

"The general welfare of society, not individual profit, is the object for which the charter is granted, and the members are not stockholders, in the legal sense of the term and no dividends, or profits, shall be divided among them * * *"

This statute does not authorize a corporation to convey its property to one of its officers on the pretense it is conveying it to him for a back salary. Defendant had no right to let Horton live upon this property for 25 years without paying taxes, then give it to him.

The charter of the defendant further provides:

"A violation of any of the provisions of this charter shall subject the corporation to dissolution at the insistence of the State."

See *State ex rel. v. Family Loan Co.,* 167 Tenn. 654, 73 S.W.2d 167; 13 Am.Jur. Sec. 1318, p. 1176.

The operation of this school for the personal gain of Horton was a misuse and abuse of its powers, and perversive of the objects for which it was created and injurious to the public. It is needless to say that under the scheme of operation as used by Horton, he evaded the payment of taxes.

It should be borne in mind that this issue was submitted to the jury, that is, whether Horton operated this school for his personal gain, and this finding was in all respects approved by the trial court.

In these two findings by the jury and the court, we fully concur.

■ This brings us to a consideration of the second proposition and that is the sale of beer by the defendant on its premises without a permit and license, was a wilful and intentional act and in direct violation of the express provisions of its charter in that it could not engage in any trading operations, and it was a violation of the criminal laws of the State as well as the nuisance statute.

We refer to the testimony of Mrs. Hazel May Thomas, R. Vol. II, page 523 as follows:

"Q. Now, I will ask you, Mrs. Thomas while on these occasions and on the premises whether or not, you have seen intoxicating beverages? A. Yes, sir.

"Q. Where did you see them? A. In a place where they sold beer and candy and stuff—cold drinks, P. X. like.

"Q. Did they have what they call a P. X.? A. Yes, sir.

"Q. What building was that in? A. It was in the old school building.

"Q. You say they sold beer there? A. Yes, sir.

"Q. Do you know how much they sold it for? A. No, sir.

"Q. Did you or anybody buy any? A. Yes, sir.

"Q. Do you know how much it cost? A. No sir, I don't.

"Q. Did you see any whiskey? A. Yes, sir.

"Q. Where did you see it? A. At the Highlander Folk School and Myles Horton's house.

"Q. How much did you see at the school building? A. It would be in gallon jugs and quart bottles.

"Q. Gallon jugs and quart bottles? A. Yes sir."

On this point we now call attention to the testimony of Mrs. Dosie Church, R. Vol. II, page 546, who testified that she was employed at this School for a number of years.

"Q. Did you see any alcoholic beverages stored there in the building property? A. Yes, sir, I have.

"Q. Have you seen much? A. Well, what do you call much?

"Q. Well, you describe what you saw, Mrs. Church? A. Well, I have saw it in bottles on the shelf. I don't know whether you call it storing it or not, but just on a shelf, and I have saw the bottles when they would be empty in the garbage cans. I have carried them out a number of times.

"Q Have you seen any jugs there? A. I went in one morning and the table was full of gallon jugs of whiskey.

"Q. Now, Mrs. Church, if you know, what else have you seen them sell there besides beer and whiskey? A. Well, I have saw them sell chewing gum and candy, razor blades they would have there in the P. X."

The record is replete with testimony of the unlawful sale of beer and whiskey at this school.

It might be well to state here the fact that many well meaning people had made contributions to this school accounts at least in part for its continued operation, but the record fails to show that the school had any plan, or standard for teaching and studies and it seems that it was operated more as a vocation work shop then as an ordinary school. The work was carried out according to the day by day, or week by week ideas of Mr. Horton.

We have considered all the assignments of error, find them without merit and they are accordingly overruled. The case will be remanded to the Circuit Court of Grundy County for the appointment of a Receiver.

It might be observed here that we base our decision on the two propositions before the Court, that is the operation of this School for the personal benefit of Myles Horton, and that in such operation he repeatedly violated the criminal laws of this State in the sale of whiskey and beer in and about this School, and that this being so, it is unnecessary for us to pass upon the constitutional question as to the mixing of white and colored, male and female, in the same school.

TOMLINSON, BURNETT, SWEPSTON and FELTS, JUSTICES, concur.