**Dr. A. A. LIVERIGHT et al., Plaintiffs,**

v.

**JOINT COMMITTEE OF the GENERAL ASSEMBLY OF the STATE OF TENNESSEE, etc., et al., Defendants.**

**Civ. A. No. 4796.**

United States District Court
M. D. Tennessee,
Nashville Division.
Jan. 11, 1968.

Charles Morgan, Jr., Atlanta, Ga., I. T. Creswell, Jr., and Reber F. Boult, Jr., Nashville, Tennessee, George E. Barrett and Whitworth Stokes, Jr., Cecil D. Branstetter, Leroy J. Ellis, III, Jordan Stokes, and Charles Galbreath, Nashville, Tenn., for plaintiffs.

Dick L. Lansden and Robert McCullough, Nashville, Tenn., Thomas Fox, Asst. Atty. Gen., State of Tennessee, Nashville, Tenn., and E. Patten Webb, Memphis, Tenn., for defendants.

## OPINION

WILLIAM E. MILLER, Chief Judge.

This is an action to enjoin a Joint Committee of the Tennessee General Assembly from proceeding into an investigation of allegedly subversive activities on the part of the Highlander Educational and Research Center Inc. (hereinafter referred to as the "Highlander Center.")

Although the Court, as indicated in this opinion is compelled to conclude that the plaintiffs are entitled to injunctive relief on the basis of the facts alleged in the complaint, it does not hold that the General Assembly of Tennessee lacks the power to investigate the Highlander Center in the area of alleged subversive activities. The Court merely holds that the authorizing resolution, as drafted by the General Assembly of Tennessee, is constitutionally inadequate for that purpose.

The plaintiffs are Dr. A. A. Liveright, a member of the board of directors of the Highlander Center; Dr. Charles G. Gomillion, the chairman of the board of directors of the Highlander Center; Dr. Scott Bates, the vice chairman of the Highlander Center; Myles Horton, the president of the Highlander Center; Lewis Sinclair, the secretary-treasurer and member of the board of directors of the Highlander Center; and the Highlander Center, a non-profit organization organized under the laws of the State of Tennessee, with offices in Knox County. Plaintiffs sue on behalf of the Highlander Center and as individuals.

The defendants are the Joint Committee of the General Assembly of the State of Tennessee, organized and created under the authority of Joint Resolution No. 14, Gen.Sess.1967; Frank Gorrell, the Speaker of the Senate, and vested with the authority to appoint members to the committee; James Cummings, the Speaker of the House of Representatives, with authority to appoint members to the committee; Fred O. Berry, Clayton P. Elam, Odell Cas Lane, Robert Booker, and W. E. Michael, all members of the committee; Joe C. Carr, the Secretary of State; Charles Worley, the Treasurer; and John Doe, the Sergeant at Arms of the committee whose identity is unknown at this time. Defendants are sued in their individual and official capacities.

The controversy centers about Joint House Resolution No. 14 which was enacted during the 1967 term of the Tennessee Legislature. This resolution, according to its preamble, was intended to:

"provide for a committee to investigate the activities of the Highlander Research Center of Knox County and organizations affiliated therewith."

The preamble continues that "[i]t has been reported that the Highlander Research Center * * * and persons and organizations affiliated therewith, may be involved in activities subversive

to the government of our State * * *," and that a committee be formed to investigate such reports with "full power to subpoena witnesses, to take testimony, to impound records, and to do all things necessary" to discover the nature of the activities of the Highlander Center and persons and organizations affiliated with it. (Appendix)

In the body of the resolution, it is provided that the committee "shall be clothed with all the powers and authority conferred upon legislative committees by Sections 3–301 to 3–325, Tennessee Code Annotated." Several of these statutes are significant in this case. Section 3–304 provides, *inter alia,* that all testimony, information, and other data procured by the committee shall be filed in the office of the Secretary of State and kept therein for public inspection. Section 3–306 provides that the committee may designate a subcommittee to exercise all of its powers including the contempt power. Section 3–308 provides that a committee shall have the power to compel the attendance of witnesses and the production of papers or other evidence *deemed material* by subpoenas and subpoenas duces tecum. Section 3–310 sets forth the offenses constituting contempt. It provides that any person who has been served by subpoena is guilty of contempt if he: (a) wilfully fails to appear; (b) having appeared, wilfully refuses to answer any question pertinent to the matter under investigation; (c) wilfully refuses to produce any papers, documents, records, or other items of evidence, deemed to be material by any committee. Section 3–311 provides that any committee shall have the power to issue and enforce process of arrest or attachment and impose penalty for disobedience and contempt, to the same extent as courts of record. Section 3–312 provides that it shall be a criminal offense, punishable by fine and imprisonment, to commit the offenses described in 3–310. Section 3–319 provides that answers directed upon claim of the privilege against self-incrimination may

not be used in evidence against the person in any criminal prosecution.

The plaintiffs contend that Joint Resolution No. 14 (hereinafter sometimes "the resolution") and statutes 3–301 to 3–325 are unconstitutional facially and as applied to plaintiffs. Primary emphasis in the complaint is given to the resolution and its alleged qualities of vagueness and overbreadth.

According to the allegations of the complaint, in 1934 the Highlander Folk School, the forerunner of the plaintiff Highlander Center, was chartered by the State of Tennessee as a general welfare corporation. Its stated purposes included adult education, the training of rural and industrial leaders, and general academic education. During the 1930's the school was primarily concerned with activities in the field of organized labor. However, following World War II, the Highlander Folk School shifted its activities from the labor field to the area of racial problems. According to the complaint, the school undertook the promotion of the participation of Negroes in the political, social, and economic life of the South. In 1959, the Tennessee Legislature ordered an investigation of the Highlander Folk School. The plaintiffs allege that the purpose of this investigation was to determine whether the school was operated on an interracial basis and whether it was engaged in civil rights activities. The plaintiffs further allege that the committee investigation focused on the interracial aspects of the organization and that the report to the legislature alleged that these interracial activities constituted subversion. Subsequently, a raid was conducted against the school by state officials and arrests were made, but no convictions were obtained. Then, either before or after this raid, the Tennessee Legislature, by resolution, directed the District Attorney General for Grundy County to institute suit for the revocation of the school's charter. The complaint in that action charged that: (1) the Highlander Folk School was operating in violation of certain compulsory segregation stat-

utes of Tennessee; (2) lewd and immoral conduct consistently took place on the Highlander Folk School's property; (3) the Highlander Folk School had engaged in the sale of liquor without a license; (4) the Highlander Folk School had been operated for the personal profit of its president, Myles Horton. Following a trial, the Circuit Court of Grundy Court ordered the revocation of the school's charter. This decision was appealed to the Supreme Court of Tennessee and the decision was affirmed on two grounds. Highlander Folk School v. State ex rel. Sloan, 208 Tenn. 234, 345 S.W.2d 667 (1961). Although the State Supreme Court upheld the judgment of revocation on the grounds that the school had sold liquor without a license and that the school was run for the personal profit of Myles Horton, it held that the compulsory segregation laws were unconstitutional.

In 1961, as the complaint in this action alleges, the plaintiff Highlander Research and Educational Center, Inc., was chartered in Knox County, Tennessee, evidently as the successor to the Highlander Folk School. It has the same president, Myles Horton, and there is substantial continuity in the officers, directors and activities of the two schools. Affidavits have been submitted by Myles Horton, Lewis Sinclair, and Martin Luther King, Jr., stating that the Highlander Center is engaged in civil rights activities. Allegedly because of these activities, the Highlander Center has been unpopular within the community of Knox County and throughout portions of the State of Tennessee. To demonstrate this unpopularity the plaintiffs have exhibited certain newspaper articles. One paper in particular, The Watchdog, April 13, 1967, p. 1, published in Knoxville, Tennessee, described raids which had taken place against the Highlander Center:

At the Highlander's wild party which was raided by the police and sheriff's officers. [sic] Mixed races were present, eleven male and female. They are actually naked, nude or jaybird and many of them got away.

What about the Townsend raid on the Highlanders? There were about forty mixed races both male and female who were put under surveillance for two days. * * * About half of this crowd was taken to the Blount County Jail. * * *

The Watchdog then went on to suggest that the state legislature should not vote appropriations so long as the University of Tennessee employed professors who belonged to the Highlander Center. The complaint alleged that, as a result of the Highlander Center's unpopularity, pressure has been brought to bear on unrelated organizations to deny the use of their facilities to the Highlander Center or to any persons who may wish freely to discuss the work of the Highlander Center. Furthermore, the plaintiffs allege that the Highlander Center was bombed by an unidentified assailant in the latter part of 1966.

In 1967, House Joint Resolution No. 13 was introduced by the nine sponsors of House Joint Resolution No. 14 and others, which would have directed various law enforcement agencies "to use all legal means to cut this cancerous growth (Highlander Folk School) from our State * * *." Among other things, the resolution stated that the school "has long been a haven for Communists, extreme leftists, fellow travelers and those who advocate the violent overthrow of our government * * *;" that the school "is nothing more than a front for wild parties, a headquarters for plots and dark schemes to upset the civil order. * * *."

The complaint alleges that resolution No. 13 was defeated. Thereafter nine of the sponsors of that resolution introduced House Joint Resolution No. 14, here involved, which authorized the investigation into the Highlander Center for alleged subversive activities.

The complaint in this action, filed June 20, 1967, requested a temporary restraining order and, following hearings, preliminary and permanent injunctions. On the same day the Court issued a limited temporary restraining order,

enjoining the committee members from taking any steps pursuant to Resolution No. 14 other than meeting and organizing as a committee and/or making plans for the future conduct and discharge of their duties under the resolution. The order of June 20, 1967 further provided that the action should be set down for hearing before the Court on June 30, 1967 to determine whether the temporary restraining order should be continued in effect, modified, or dissolved. Since the plaintiffs had stated in their complaint that the matter was one for a statutory three-judge court under 28 U.S.C. § 2281 (1964), the Court reserved a decision on this question until it could be argued at the June 30, 1967 hearing. It was provided in the order that the parties should have the right to produce any evidence by witnesses or affidavits at the hearing.

At the hearing on June 30, the parties argued the appropriate issues, and in light of the arguments, the Court suggested that the defendants file a motion to dismiss. Pending the filing and determination of this motion and the issue as to convening a three-judge court, the defendants were enjoined from proceeding under Resolution No. 14 further than as permitted by the order of June 20. On this same day, defendants Gorrell, Cummings, Carr, and Worley moved that the complaint be dismissed as to them, and the Court took this matter under advisement also.

On July 13, 1967, the defendants filed motions to dismiss and to strike various matters in the complaint. Briefs were subsequently submitted.

■ A matter for brief preliminary consideration is defendants' motion to strike certain material from plaintiffs' pleadings. Rule 12(f), Fed.R.Civ.P., provides in part that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

Defendants' first objection is to historical facts in the complaint relating to the Highlander Folk School. They next object to the introduction of newspaper articles, to any reference to Resolution No. 13, and to statements in the affidavit of Lewis Sinclair. The Court considers none of the material objectionable and for the reasons mentioned hereinafter in this opinion feels that the motion must be denied. 2A Moore's Federal Practice, para. 12.21(2) (2d ed. 1967).

■ Jurisdiction to adjudicate this controversy is found under 28 U.S.C. § 1343(3):

> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person * * * [t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States * * *.

In light of the allegations of violations of the First and Fourteenth Amendments by State action, the Court is of the opinion that it has undoubted jurisdiction to entertain the action.

Relevant to the jurisdictional question is whether a single judge or three-judge district court is the proper tribunal to hear the case.

■ The Court concludes that a three-judge court is not proper in the case at bar. The controlling statute, 28 U.S.C. § 2281 (1964), provides:

> An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefore is heard and determined by a district court of three judges under section 2284 of this title.

The plaintiffs have argued at the oral hearing and in their briefs that the complaint presents the requisite elements for a three-judge court: (1) State statutes are challenged; (2) the suit is brought against state officers; (3) injunctive relief is sought; and (4) the complaint alleges that the state statutes are in conflict with the United States Constitution.

If the requirements of Section 2281 were actually present a single judge court would not have jurisdiction to decide the case on the merits, Stratton v. St. Louis S. W. Ry., 282 U.S. 10, 51 S.Ct. 8, 75 L.Ed. 135 (1930), and the district court judge would be compelled by law to request the Chief Judge of the Circuit to designate a three-judge court. 28 U.S.C. § 2284 (1964).

■■ Nevertheless, the single judge must make the initial determination of the applicability of Section 2281. Ex parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L.Ed. 990 (1928); Fiumara v. Texaco, Inc., 240 F.Supp. 325 (E.D.Pa.1965). If he decides that a Section 2281 court is not called for, and federal jurisdiction is otherwise present, the district court must adjudicate the case in the usual manner.

The plaintiffs, in their complaint, have charged that twenty-five statutory provisions, Tenn.Code Ann. §§ 3–301–325 (1955), and House Joint Resolution No. 14, 1967 Gen.Sess., are unconstitutional both facially and as applied to plaintiffs.

The threshold question under Section 2281 is whether the complaint states a substantial federal question. This matter is jurisdictional and hence within the competence of the single judge. Should the purported federal question be unsubstantial, the court must dismiss this particular claim. Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933). Unsubstantiality may arise either because the claim is obviously without merit or because previous decisions of the Supreme Court have foreclosed the subject. Baker v. Carr, 175 F.Supp. 649 (M.D. Tenn.1959). Having examined the complaint, the briefs, and the statutes involved, the Court is convinced that plaintiffs' attack on Sections 3–301 to 3–325 is plainly unsubstantial. The plaintiffs have merely alleged in the most general fashion that the twenty-five sections are void for overbreadth and vagueness. An examination of one of these sections illustrates the frivolousness of plaintiffs' broad attack. Section 3–322 reads:

3–322. Compensation of witnesses.— Any person or persons subpoenaed to appear as a witness before any such committee, or subcommittee, shall be entitled to compensation including travel pay, as is now provided by law in respect of witnesses subpoenaed to appear in civil cases in courts of record of this state; and such compensation for witnesses, when certified as due and payable by the chairman of any such committee, or the member or members thereof acting as such subcommittee, shall be paid by the treasurer of the state, upon warrants drawn by the director of accounts, out of any funds of the state not otherwise appropriated. [Acts 1931, ch. 3, § 15; mod. C.Supp.1950, § 172.15].

It could hardly be argued successfully that this section is vague or violates the plaintiffs' constitutional rights. Plaintiffs, apparently recognizing that their position cannot plausibly be argued, have neither explained their reasoning as to any of the sections, nor have they cited any convincing authority. Such a generalized, unspecific attack does not present a substantial federal question. German v. South Carolina Ports Authority, 295 F.2d 491 (4th Cir. 1961). If this were the only claim presented, the Court would be required to dismiss the complaint.

However, the attack upon Resolution No. 14 does present a substantial federal question. The plaintiffs have alleged facts and advanced arguments and authority to demonstrate that there is a possibility that relief could be granted. Thus, at this juncture the Court must determine whether the complaint presents a case which contains the elements necessary to warrant a three-judge court.

■ To be within Section 2281, the complaint must seek to enjoin the enforcement, operation, or execution of a state *statute*. In A. F. of L. v. Watson, 327 U.S. 582, 592–93, 66 S.Ct. 761, 766, 90 L.Ed. 873 (1946), the Court explained that, "the word 'statute' in 266 [the predecessor of 2281] is a compendious summary of various enactments, by whatever method they may be adopted, to which a State gives her sanction * * *." This language would imply that a joint resolution may be within the meaning of "statute." However, it is not necessary for this Court to decide this point.

Assuming, *arguendo*, that Resolution No. 14 is a statute as defined by A. F. of L. v. Watson, supra, its application is too narrowly restricted to meet the further strict construction requirement that the statute be statewide in application.

■■ As Mr. Justice Frankfurter explained in Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941), and reiterated in Florida Lime & Avocado Growers v. Jacobsen, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568 (1960) (dissenting), the statute is a matter of procedure to be viewed restrictively, and is not one of broad social policy which must be generously construed. There are two reasons underlying this rule of construction. First, the three-judge court statute imposes a "serious drain upon the federal judicial system." *Phillips*, supra. Although this claim has been statistically disputed by commentators,[1] this Court can attest from its own experience that the relatively small number of three-judge court cases tried each year is misleading if it purports to represent the total disruptive effect on the federal judicial system. As the Fourth Circuit observed in Jacobs v. Tawes, 250 F.2d 611, 615 (4th Cir. 1957), the machinery is certainly "cumbersome." It is common knowledge that the federal court dockets are burgeoning with cases to be heard. Since 28 U.S.C.A. § 2284(4) provides that three-judge court cases are to be given precedence over other cases, the normal court calendars are disrupted so that three judges must rearrange their schedules to hear the case at the earliest practicable day. This procedure inconveniences both the judges and the parties who were previously scheduled to appear before the respective courts. Moreover, from the beginning of the trial to the filed opinion, the process is more time-consuming than is a case heard by a single judge. Conferences are required to adjudicate the issues, to reconcile differences, and to settle the terminology of opinions. Thus, while the process is more deliberate, it is also more inefficient in terms of judicial expedition. The courts, in construing the literal language of Section 2281, must attribute to Congress an intention to coordinate the extraordinary statutory three-judge court with other statutes which govern the normal workings of the federal judicial system.

■ The second reason for the rule of strict construction is that the lower courts should be provided with a relatively clear test to determine when the three-judge court statute is applicable. It must necessarily be somewhat mechanical. One of the purposes of the statute is to expedite important litigation. Hence, a broad construction of 2281 would work at cross-purposes with the Act in that the single district court judge would be required to engage in extensive adjudication to determine whether a three-judge court should be convened. Swift v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed. 2d 194 (1965), so reasoned in overruling Kesler v. Department of Public Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962). In that case the Court had formulated a liberal rule of construction for the lower courts to follow in the application of Section 2281 to Supremacy Clause cases. The district court had found itself unable to apply the *Kesler* rule due to the fact that the district court judge could not determine whether the case involved more or less statutory construction than did *Kesler*. The Supreme

---

1. E. g. Note, 77 Harv.L.Rev. 299, 305 (1963).

Court confessed that it also found the rule elusive and stated that, "[s]uch a formulation, whatever its abstract justification, cannot stand as an every-day test for allocating litigation between district courts of one and three judges." Swift v. Wickham, supra at 125, 86 S.Ct. at 266.

Although the Supreme Court has not passed upon the precise issue in this case—whether Section 2281 requires the convening of a three-judge court when a legislative resolution is directed primarily toward one corporation—related decisions have established the rule that the state statute must be of general, statewide application.

The source of this doctrine is generally recognized to be Ex parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L.Ed. 990 (1928). In that case a property owner in Phoenix, Arizona, sought to enjoin the city from proceeding under a municipal resolution which directed the paving of a particular street. The plaintiff charged that the state statute which authorized such action was unconstitutional. The Court, in holding that a three-judge court was not proper, stated that although the constitutionality of a state statute was challenged, the suit only involved matters of interest to a particular municipality. Consequently, it did not differ substantially from one where the sole claim is that a city ordinance is invalid—a claim which clearly does not present a question to be heard by three judges. See Calhoun v. City of Seattle, 215 F. 226 (W.D.Wash.1914).

The *Collins* doctrine has been consistently adhered to in the application of Section 2281. In Rorick v. Bd. of Com'rs., 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1242 (1939), the Court held that a three-judge court was not in order where the allegedly unconstitutional state statute applied to only one drainage district. A

like decision was reached in Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). A state statute on its face applied to all school districts within the State of Virginia and the district court judge's decision was likely to have repercussions throughout the state. Despite these factors, the Supreme Court ruled that the statute actually concerned a situation unique to one county and was a proper case for single judge treatment. The most recent pronouncement of the Court, Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967), reaffirms this line of decisions. An Alabama statute prescribed the apportionment and districting scheme for electing members of the Houston County Board of Revenue and Control. Mr. Justice Douglas summarized a historical review of Section 2281 by saying:

> The Court has consistently construed the section as authorizing a three-judge court not merely because a state statute is involved but only when a state statute of *general and statewide application* is sought to be enjoined. [emphasis supplied].

The plaintiffs argued that there was sufficient similarity between the statute governing Houston County and those governing other counties to give the case a statewide interest. The Court rejected this argument:

> * * * [E]ven a variety of different devices, working perhaps to the same end, still leaves any one device local rather than statewide for the purposes of the statutory three-judge court.

The plaintiffs, in the case before this Court, suggest that the foregoing cases may mean that the grounds for regarding a statute as sufficiently narrow for single judge treatment are solely geographical.[2] Therefore, according to plaintiffs, although the "statute" applies to but one

---

2. This same suggestion is made by Currie, The Three-Judge Court in Constitutional Litigation. 32 U.Chi.L.Rev. 1, 32, n. 179 (1964). However, the author, while discounting the possibility, also points out that the geographical limitation would

mean that if the legislators made the statute applicable to all but one insignificant corner of the state, the case would be heard before a single judge instead of a three-judge court.

corporation and those affiliated with it, it is statewide in the sense that it applies to those persons affiliated with the Highlander Center wherever they are located within the state.

The Court finds the geographical distinction untenable. *Collins, Rorick, Griffin,* and *Moody* cannot be read to stand for the proposition that a statute which applies to one corporation is of more statewide concern than a statute which applies to one municipality or school district. Such an interpretation would be tantamount to declaring that an injunction issued against the enforcement of a statute applicable to Memphis, Tennessee, a city of over a half million population, may be of less statewide interest than a statute directed toward the most insignificant corporation in the State but having some interests beyond the boundary of a particular county or city. The import of the relevant Supreme Court decisions is that the state statute must be applicable to substantially all members of the class to which the statute is directed and that it must be of more than local or parochial interest. This interpretation is in harmony with the purpose of Congress in creating the three-judge court. The predecessor of Section 2281 was enacted by Congress "to assuage growing popular displeasure with the frequent grants of injunctions by federal courts against the operation of state legislation regulating railroads and utilities in particular." Swift v. Wickham, supra. It was intended to prevent the paralyzation of the state's entire regulatory scheme, Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S. Ct. 554, 9 L.Ed.2d 644 (1963), and the "improvident state-wide doom * * * of a state's legislative policy," Phillips v. United States, supra, by a single district court judge.

In the instant case, the resolution deals primarily with one institution, the Highlander Center. It is difficult to distinguish a statute directed toward one institution and one which is directed toward one municipality, Ex parte Collins, supra, or one drainage district, *Rorick,*

supra, or one school board, *Griffin,* supra, or one county, Moody v. Flowers, supra. Furthermore, it cannot be said that an injunction issued against the members of the joint committee to restrain them from investigating those associated with one eleemosynary corporation would either paralyze the state's regulatory scheme or doom its legislative policy.

■ In light of the facts of this case, it is only necessary to hold, and the Court so holds, that a three-judge court is not required by Section 2281 when a state statute is applicable to one corporation and the organizations and individuals associated with it. See, Hatfield v. Bailleaux, 290 F.2d 632, 9th Cir. (1961).

The question which remains is whether, on the basis of the facts alleged in the complaint, Resolution No. 14 is void both facially and as applied to plaintiffs in that it is vague and indefinite and unlawfully deters the plaintiffs' exercise of their First Amendment rights. In deciding this question, the Court does not construe the complaint to be an all-encompassing attack on the investigating function of the General Assembly, but rather as an attack on a particular resolution which authorizes a particular investigation.

■ It is beyond dispute that the state legislatures have the right to conduct investigations through a duly authorized committee. Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). Although this right exists by force of implication and continued usage, and not by specific constitutional grant, investigations perform a valuable service when properly exercised. Consequently, the judiciary has been cautious in imposing restraints. When properly conducted an investigation provides the lawmakers with a first-hand insight into areas which would not otherwise be observable from the halls of the legislature. By summoning evidence of current problems before them, the legislators are better equipped to appraise the need for new statutes or to correct defects in the old. As may be expected, those who may be the subjects

of restraining legislation, and who are most·possessed of vital information, are not always willing to testify. For this reason, most states, including Tennessee, have enacted statutes which vest in legislative committees subpoena and contempt powers by which to require compliance with committee summons. These statutes are a necessary adjunct to the investigative power and are clearly within the constitutional authority of the legislature.

Nevertheless, the investigative power, as exercised by committees, has been subject to abuse. Recent Supreme Court decisions have recognized that vital First Amendment freedoms may be abridged by legislative investigations. DeGregory v. New Hamp. Atty. Gen., 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); Gibson v. Florida Legislative Investigating Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1962). Despite the fact that the First Amendment[3] is phrased in terms of restraints upon congressional power, the caveat is equally applicable to the states through the Fourteenth Amendment, Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), and encompasses the lawmaking functions as well as the "law" itself.[4] Watkins v. United States, supra.

In the case at bar, the Tennessee General Assembly has authorized by resolution an investigation to determine if the Highlander Research and Education Center, Inc., and persons and organizations associated with it, have engaged in "activities subversive of the government of the State." While admittedly the states have a legitimate concern in this area, Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959); compare Commonwealth of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640

(1956), such investigations are fraught with constitutional dangers. The term "subversion" is capable of multiple meanings. Without exception the term connotes unpopular words or deeds. Too often, "subversion" takes on the meaning of any activity which is not in tune with the prevailing social, political, economic, or religious values of the community. An investigation into possible subversive activities would normally bring into question the beliefs and opinions of those witnesses who are associated with the organization under inquiry. E. g., DeGregory v. New Hamp. Atty. Gen., supra; Gibson v. Florida Legislative Investigative Committee, supra; Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); United States v. Watkins, supra. When the inquiry is conducted by the use of compulsory process, the judiciary must bear the responsibility of protecting individual rights. As Chief Justice Warren observed in Sweezy v. New Hampshire, supra at 250, 77 S. Ct. at 1211:

> Merely to summon a witness and compel him, against his will, to disclose the nature of his past expressions and associations is a measure of governmental interference in these matters. These are rights which are safeguarded by the Bill of Rights and the Fourteenth Amendment.

■ The rights involved are those of speech and association. The abridgment of these rights may take the form of compulsory exposure of the individual's associations and beliefs. Although these First Amendment freedoms are not absolutes, Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961), a compelling state interest must be shown to justify intrusion. Keyishian v. Board of Regents, 385

---

3. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the Government for a redress of grievances. U.S.Const. Amend. I.

4. While it is true that there is no statute to be reviewed, and that an investigation is not a law, neverthless, an investigation is part of lawmaking. The First Amendment may be invoked against infringement of the protected freedoms by law or lawmaking. *Watkins* at 197.

U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

In DeGregory v. New Hamp. Atty. Gen., supra, the New Hampshire Legislature had designated the attorney general as a one-man investigative committee and authorized him to investigate subversive activities within the state. The petitioner was summoned before the "committee" and was questioned about the alleged subversive activities. He refused to answer certain questions and was cited for contempt. The United States Supreme Court, in reversing his conviction, ruled that the exposure of his associational and political past was not justified by a compelling state interest. And, in Gibson v. Florida Legislative Investigative Committee, supra, a similar investigation sought the membership list of the Miami branch of the N.A.A.C.P., an organization located in the State of Florida. The president of the chapter refused to produce the association's records and was held in contempt. The Supreme Court of the United States found that the refusal to expose the names of persons associated with the organization was within the protection of the First Amendment. The Court explained:

> * * * [These protections] * * * are all the more essential here, where the challenged privacy is that of persons espousing beliefs already unpopular with their neighbors and the deterrent and "chilling" effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association is consequently the more immediate and substantial. Supra at 556–557, 83 S.Ct. at 899.

As the Court points out, exposure may retard the right of the individual to speak and associate freely. The exposure which issues from committee examination focuses attention on the individual and his unpopular beliefs and is capable of bringing forth reprisals from the public at large.[5] Such reprisals are a form of punishment, and may be as effective as imprisonment in curbing First Amendment freedoms. Many of our most cherished political and constitutional reforms have occurred as the result of the advocacy of those who, at the time, were charged with harboring "subversive" and "revolutionary" ideas. It has been traditional for Americans to engage freely in political activities and discussions, and to join groups and organizations advocating various political causes, many of them unpopular with the majority.

In recognition of the dangers to such freedom of expression and association, so essential to the operation of a democratic system, as the result of the unfettered right of legislative inquiry and investigation, the Constitution imposes certain standards upon legislative committees which safeguard the individual. Exposure of the private affairs of individuals is a violation of the First Amendment unless it is justified by a valid function of the legislative branch. Watkins v. United States, supra. Thus, in order for an investigation into individual affairs to be valid, it must be related to a lawful legislative purpose. Kilbourne v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1880). Moreover, there must be a nexus between the information sought and the overriding or compelling state interest claimed to justify the invasion of protected rights. NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). To insure that the committee's inquiries are directed toward these ends, the legislature must instruct the committee in the use of its powers. The authorizing resolution must "spell out that group's jurisdiction and purpose with sufficient particularity." Watkins v. United States, supra.

In some investigations, the legislative purpose is presumed. E. g., McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580 (1927). This course of action is appropriate when, as in McGrain, First Amendment freedoms are not threatened. There is little harm in presuming that the committee will eventually

---

5. Barrett, The Tenney Committee (1951).

demonstrate that the legislature has clothed it with a legislative purpose and that a nexus will subsequently be made apparent. But different considerations compel the Court to inquire into the legislative purpose when the rights of speech and association are involved. Jordan v. Hutcheson, 323 F.2d 597 (4th Cir. 1963). See Gibson v. Florida Legislative Investigation Committee, supra at 545; NAACP v. Button, supra 371 U.S. at 439, 83 S.Ct. 328; Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); Schneider v. State, 308 U.S. 147, 161; Barsky v. United States, 83 U.S.App.D.C. 127, 167 F.2d 241 (D.C.Cir.1948) (dissenting opinion). In the words of Mr. Justice Rutledge in Thomas v. Collins, 323 U.S. 516, 529–530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945):

> * * * [T]he usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment.

■ Within the Bill of Rights, First Amendment freedoms occupy a preferred position. See Cramp v. Bd. of Public Education, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); Smith v. People of the State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). These freedoms, particularly speech, press, and association, are fundamental to our democratic system of government. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Inasmuch as they are peculiarly sensitive to subtle means of repression, the courts are especially vigilant to protect their unfettered exercise. Bates v. City of Little Rock, supra; Kovach v. Maddux, 238 F.Supp. 835 (M.D.Tenn.1965).

The defendants would have the Court presume that the investigation in this case will pursue a valid legislative purpose and that the committee will eventually demonstrate a nexus between that purpose and the plaintiffs. Having so presumed, the Court would then be compelled to find that there exists no threat

of irreparable injury, and accordingly that no cause for equitable relief is present.

However, the Court believes that the threat of irreparable injury is present and that the plaintiffs have alleged a cause for equitable relief. The plaintiffs have alleged in the complaint and submitted at the hearing affidavits that the Highlander Center is engaged in First Amendment activities. Plaintiffs have also alleged that the Highlander Center is an organization which is unpopular within the community and that exposure of records and opinions would have the effect of "chilling" the exercise of First Amendment freedoms. Furthermore, the legislative history, as alleged in the complaint and as partially substantiated by the decision in Highlander Folk School v. State ex rel. Sloan, supra, indicates that a similar committee has construed the term "subversive" to include interracial activities.

Since the evil to be avoided is unjustified exposure of unpopular beliefs, opinions, or association, it would appear that indulgence in the presumption that the committee will pursue a valid legislative purpose, and the resulting conclusion that irreparable injury is not threatened, might well render subsequent judicial relief a mere formality. See United States v. Owlett, 15 F.Supp. 736, 743 (M.D.Pa. 1936). If the Court does not require a defined legislative purpose before the actual demand for compliance by compulsory process, the witness' recourse is to comply fully and risk exposure or to refuse and accept a contempt citation. By the time that judicial review is obtained, the witness has already been publicly stigmatized, either through the exposure of his unpopular beliefs and associations or through being characterized as one who is sympathetic to movements which seek to subvert the government. Compare Brooks v. Briley, 274 F.Supp. 538 (M.D.Tenn.1967); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1964).

■ Having examined Resolution No. 14 the Court is of the opinion that

the resolution is void on its face for vagueness and overbreadth. This resolution is the controlling charter of the committee's powers. United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953). The use of the word "subversive" in the resolution leaves too much to the discretion of the committee in this sensitive area of First Amendment freedoms, a commission to roam at large into any and all activities and functions of the Highlander Center without affording significant guidance as to means or purpose. No opinion is expressed as to how the term "subversive" could be validly circumscribed or defined for investigative purposes. It is sufficient to note that neither "force" nor "violence" is mentioned in the resolution now under scrutiny. As the Court pointed out earlier in this opinion, "subversive" can be equated with almost any unpopular activity, a considerable part of which may not be forbidden by law. See Keyishian v. Board of Regents, supra; Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). Recent cases illustrate that the "vice of vagueness" is not confined to criminal statutes. Watkins v. United States, supra 354 U.S. at 209, 77 S.Ct. at 1173. NAACP v. Button, supra 371 U.S. at 432–433, 83 S.Ct. at 338, stated the proposition in these words:

> It makes no difference that the instant case was not a criminal prosecution * * * The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. Cf. Marcus v. Search Warrant, etc., 367 U.S. 717, 733, 81 S.Ct. 1708, 1717, 6 L.Ed.2d 1127. These freedoms are delicate and vulnerable * * *. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions.

In the case before the Court, the General Assembly of the State of Tennessee has delegated to a joint committee the authority to investigate the plaintiffs, and has further authorized the committee to utilize criminal sanctions in enforcing their demands for information. The threat to protected liberties is twofold. First, the overbroad and imprecise term "subversive" does not sufficiently apprise the plaintiffs of the nature of the information which the defendants will seek. Between the time of the passage of the resolution and the actual investigation, the plaintiffs might well be reluctant to speak on certain protected matters or associate with certain individuals for fear that the committee will classify them as "subversive" at the hearings and demand public exposure of these activities. Second, the undefined term "subversive" does not provide the requisite guidance by the General Assembly for the committee to insure that the inquiry is within constitutional boundaries. The First Amendment not only sanctions the right to speak freely and associate without government interference, it also protects the right *not* to speak or *not* even to inform the government of associations, unless the government has demonstrated a compelling state interest in requiring disclosure and a nexus between the interest and the individual. A committee, lacking the collective wisdom of the entire legislature, is apt to utilize its powers to obtain information neither needed nor desired by the legislature unless the legislature carefully delineates the scope of inquiry. Watkins v. United States, supra. The conceivable result is that First Amendment freedoms may be encroached upon unintentionally, but with fatal effects which cannot be remedied by subsequent legislative or judicial relief.

The Court finds that Resolution No. 14, Gen.Sess.1967, is void on its face for vagueness and overbreadth in that it has the effect, on the basis of the facts alleged, of "chilling" First Amendment freedoms. It is peculiarly susceptible of

a "sweeping and improper application." Dombrowski v. Pfister, supra.

In conformity with this opinion, an order will be entered (a) denying the plaintiffs' request that the Court take steps to have a three-judge court constituted and convened; (b) sustaining the defendants' motion to dismiss the complaint insofar as it challenges the validity of Tenn.Code §§ 3–301 through 3–325; (c) with the exception of the defendants Joe C. Carr and Charles Worley, otherwise overruling the defendants' motions to dismiss the complaint and to strike portions therefrom; (d) sustaining the motions of defendants Carr and Worley dismissing the complaint as to them since it is not necessary to restrain them to accomplish the injunctive purposes of the complaint; and (e) enjoining the remaining defendants, until further orders of the Court, from proceeding or acting further under the terms and provisions of Joint House Resolution No. 14.

### APPENDIX

The following resolution was passed by the Tennessee General Assembly and is the resolution pursuant to which the legislative committee would investigate the Highlander Research and Education Center, Inc.:

### HOUSE JOINT RESOLUTION No. 14
#### by

| | |
|---|---|
| Lane | Cody |
| Senter | Adcock |
| Morton | Atkin |
| Webster | Jensen |
| | Atchley |

A RESOLUTION to provide for a committee to investigate the activities of the Highlander Research Center of Knox County and organizations affiliated therewith.

WHEREAS, It has been reported that the Highlander Research Center of Knox County, and persons and organizations affiliated therewith, may be involved in activities subversive to the government of our State and that it is in the interest of the State and its people that a committee of this General Assembly be constituted for the purpose of investigating such reports and be granted full power to subpoena witnesses, to take testimony, to impound records, and to do all things necessary to ascertain the nature of the activities of the said Highlander Research Center and of such persons and organizations as are affiliated with it;

NOW, THEREFORE,

SECTION 1. BE IT RESOLVED BY THE HOUSE OF REPRESENTATIVES OF THE STATE OF TENNESSEE, THE SENATE CONCURRING, That a joint committee of five members composed of two senators and three representatives be and the same is hereby created, the members of the committee to be appointed by the Speakers of the respective Houses; and that the committee hereby created shall have complete authority to investigate the Highlander Research Center of Knox County, and to investigate its activities and the activities of all persons and organizations associated therewith.

SECTION 2. BE IT FURTHER RESOLVED, That said Committee shall have full and complete power to subpoena and compel the attendance of witnesses, to adopt rules of procedure, to order and compel the production of all records and documents pertaining to the Highlander Research Center and its activities and the activities of all persons and organizations connected therewith, and to do all things necessary to the end that said investigation shall be full and complete; said Committee shall be clothed with all the powers and authority conferred upon legislative committees by Sections 3–301 to 3–325, Tennessee Code Annotated.

SECTION 3. BE IT FURTHER RESOLVED, That said Committee shall have the authority and is hereby directed to employ and contract for the services of not more than two attorneys of ability

and known integrity to aid and assist the Committee in the making of said investigation.

SECTION 4. BE IT FURTHER RESOLVED, That said Committee shall have the authority to employ such clerks and clerical and other help as it may deem advisable and to provide office space and equipment for Committee personnel, to appoint a sergeant-at-arms and any assistants necessary with full authority to execute any and all legislative process in any county of the State, including but not restricted to subpoenas and subpoenas duces tecum as may be authorized by the Committee. The Committee shall likewise be empowered to incur for itself or members of its staff necessary expense in connection with travel, stenographic services, court reporters, et cetera.

SECTION 5. BE IT FURTHER RESOLVED, That the full expense of the investigation conducted by this Committee be included in the Miscellaneous Appropriations Bill.

SECTION 6. BE IT FURTHER RESOLVED, That said Committee be directed to report the result of its investigation to the Senate and House of Representatives with such recommendation as may be deemed advisable and proper at the earliest practicable moment.

SECTION 7. BE IT FURTHER RESOLVED, That said Committee shall make at least an interim report to both Houses of the General Assembly at least ten days before its *sine die* adjournment which report shall embody a detailed statement of the progress made by said Committee, the course being pursued and the result of said investigation to that date, and the expenses incurred by the Committee to the date of said report; that the total expense of the investigation provided for by this resolution be limited to $5,000.00, such limitation of expenditures to be effective until the making of said interim report, at which time the General Assembly shall determine whether what funds, if any, shall be made available for the further work of the Committee.