David L. GOLDMAN and Robert S. Cohen, individually and on behalf of those similarly situated, Plaintiffs,

v.

Jack OLSON, Robert W. Warren, Ernest C. Keppler, Leland S. McParland, Carl W. Thompson, William C. Hansen, Walter R. Chilsen, individually and as Chairman and Members of the Select Senate Committee appointed pursuant to Senate Resolution Thirteen, Senate Substitute Amendment One to Senate Resolution Thirteen, Defendants.

No. 67–C–152.

United States District Court
W. D. Wisconsin.

June 28, 1968.

Percy L. Julian, Jr., Michael A. Reiter, Madison, Wis., William M. Kunstler, Arthur Kinoy, New York City, Dennis Roberts, Harriet Van Tassel, Morton Stavis, Newark, N. J., for plaintiffs.

Bronson C. La Follette, Atty. Gen., James H. McDermott, Asst. Atty. Gen., Madison, Wis., for defendants.

Before FAIRCHILD, Circuit Judge, JAMES E. DOYLE and GORDON, District Judges.

JAMES E. DOYLE, District Judge.

This is an action for a declaration that an investigatory resolution of the Wisconsin State Senate violates the Constitution of the United States, and for appropriate injunctive relief. Jurisdiction is asserted under 28 U.S.C. § 1343(3) and (4), and 42 U.S.C. § 1983, among other provisions.

The complaint alleges that plaintiff Goldman is a student at the University

of Wisconsin, and that he is president of the Madison chapter of Students for a Democratic Society. He has been subpoenaed to appear before a Select Senate Committee, operating pursuant to Senate Resolution 13, and Substitute Amendment 1 to Resolution 13, of the Senate of the State of Wisconsin.[1] He sues on his own behalf and on behalf of others similarly situated, including all members of the Students for a Democratic Society.

Plaintiff Cohen is alleged to be a graduate student and teaching assistant at the University of Wisconsin. He has also been subpoenaed to appear before the Select Senate Committee. He sues on his own behalf and on behalf of others similarly situated.

On October 18, 1967, there occurred an incident in and near the Commerce Building on the Madison campus of the University. A demonstration was conducted by a large number of people, most of whom presumably were students, against the holding of job interviews there by the Dow Chemical Company. The incident was extensively reported by newspaper, television and radio. Reportedly, the demonstration included physical obstruction of halls and doorways in the Commerce Building. Police action occurred. Injuries and hysteria ensued.

In response to these events, on October 20 the Senate adopted the Resolution under attack here. It refers generally to "the riotous situation occuring on the campus during the week of October 16th". It declares that this "situation" "appears prima facie to violate such law and policy"; "such" law and policy appear to relate to a preceding statement that it is the "policy" of the state "to encourage all persons to use the facilities of the University for all lawful purposes, including the right to interview and recruit for any lawful employment. * * *" The Resolution further declares that "student leaders of such riotous and unlawful conduct appear further to be leaders in the WEB DuBois Club and the Students for a Democratic Society". The Resolution then provides for a Select Committee "for the purpose of gathering the facts with respect to the riotous and unlawful activities of the week of October 16th and any prior or further such activities and the possible involvement of the WEB DuBois Club and Students for a Democratic Society in such activity. * * *"

Defendants are members of the Committee operating pursuant to the Resolution.

Plaintiffs claim that the defendants, acting under color of the Resolution, have undertaken to subject plaintiffs and others similarly situated to the deprivation of rights, privileges and immunities secured to them by the Constitution and laws of the United States; that the Resolution is invalid as written in that it violates the First and Fourteenth Amendments to the United States Constitution by reason of vagueness and overbreadth; that the Resolution is invalid as applied to plaintiffs and others similarly situated in that it would force public disclosure of opinions and associations of private citizens and would create and stimulate public stigma and scorn; that subpoenas were served upon plaintiffs on November 7, 1967, commanding them to appear before the Committee at a public hearing on November 9, 1967, "for the purpose of embarrassing, harassing and intimidating plaintiffs" and to deter them from the exercise of their First Amendment rights; and that there is no legitimate

1. It is clear from the pleadings that only Substitute Amendment 1 to Senate Resolution 13 was approved by the Senate (October 20, 1967) and only it is applicable, except insofar as Resolution 13 as originally offered (February 23, 1967) provides relevant background. Therefore, in this opinion and order, the term "Resolution" will denote only Substitute Amendment 1 to Senate Resolution 13, unless otherwise noted. Both the Resolution as originally offered and Substitute Amendment 1 are set forth in an appendix to this opinion.

legislative purpose of the Committee investigation.

The record reveals that plaintiff Goldman was called to testify on November 9 and did testify. He was advised that questioning of him would be resumed on another occasion, and he and plaintiff Cohen were instructed that they would be given notice of the next meeting of the Committee and that they would be expected to be present. A temporary restraining order has been issued enjoining the defendants from requiring either or both of the named plaintiffs to appear before the Committee for the purpose of being questioned, pending hearing and determination by a three-judge court.

The matter came on for hearing before this three-judge court, convened pursuant to 28 U.S.C. § 2284. The parties were invited to discuss in their briefs and orally: (1) whether this United States District Court enjoys jurisdiction over the subject matter; (2) whether the complaint states a claim upon which relief may be granted; and (3) whether the action is appropriate to a single-judge court or a three-judge court. In their pleadings, brief, or oral argument, defendants have reasserted, in addition, that by virtue of Amendment XI to the United States Constitution this court lacks jurisdiction over the persons of the named defendants, and that this action is not properly a class action.

## SUBJECT MATTER JURISDICTION

■ Defendants' contention that Amendment XI to the United States Constitution deprives this court of jurisdiction over the subject matter is without merit. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Wright, Handbook of the Law of Federal Courts (West, 1963), § 48.

■■ Subsections (3) and (4) of 28 U.S.C. § 1343 confer upon federal district courts original jurisdiction of actions brought under 42 U.S.C. § 1983. There is no requirement of a jurisdic-

tional amount. Hague v. C. I. O., 307 U.S. 496, 513, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Douglas v. City of Jeannette, 319 U.S. 157, 161, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). For jurisdictional purposes, the complaint meets the requirements of § 1983, by alleging that the defendants, under color of law, have undertaken to subject the plaintiffs to the deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States.

■ Defendants contend that § 1983 reaches only to persons who act "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory", and that a resolution of one house of the bicameral Wisconsin legislature is neither a statute, ordinance, regulation, custom, nor usage of a state. This historic remedial Act of 1871 is not to be so strictly construed. Monroe v. Pape, 365 U.S. 167, 170–187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Thus, a resolution of the Wisconsin Senate is a "statute" for purposes of § 1983, despite questions whether it is a statute for other purposes, such as those reflected in 28 U.S.C. § 2281. In any event, it is not the Resolution alone under which defendants act. It is an implied power or "usage", presumably having its roots in the state constitution, State ex rel. Rosenhein v. Frear, 138 Wis. 173, 176–177, 119 N.W. 894 (1909), by which the legislature is authorized to conduct investigations.

In Jordan v. Hutcheson, 323 F.2d 597 (4th Cir., 1963), which involved a statute rather than a resolution, the court reversed a holding by the district court that it lacked jurisdiction to entertain a suit for injunctive relief brought under 28 U.S.C. § 1343(3) and 42 U.S.C. § 1983 by persons subpoenaed to appear before a Committee of the Virginia State Legislature. The court stated (at p. 601):

"Although the federal courts will recognize and respect the state's right to exercise through its legislature broad investigatory powers, neverthe-

less these powers are not unlimited and it remains the duty of the federal courts to protect the individual's constitutional rights from invasion either by state action or under color thereof. Especially is this true in the sensitive areas of First Amendment rights and racial discrimination."

This court has original jurisdiction over the subject matter of this action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1343(3) and (4).

## JURISDICTION OVER THE PERSONS OF THE DEFENDANTS

■ Defendants contend that Amendment XI to the United States Constitution deprives this court of jurisdiction over their persons. This contention is also without merit. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Wright, Handbook of the Law of Federal Courts (West, 1963), § 48.

## CLASS ACTION

Whether either of the plaintiffs is entitled to bring this action on behalf of the class described in the complaint is an issue not yet explored. For the purpose of this opinion, the action will be viewed as an action by only the named plaintiffs as individuals.

## THE NECESSITY OF THREE JUDGES

This action insofar as it seeks injunctive relief is appropriately determined by three judges.[2] 28 U.S.C. § 2281 reads:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under

State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

The Resolution is being challenged on the ground of its alleged unconstitutionality, and an injunction is sought to restrain its enforcement, operation or execution by officers of a state. With respect to the necessity for a three-judge court, the questions are: (1) whether a resolution of one house of a bicameral legislature is a "state statute" within the meaning of 28 U.S.C. § 2281; and (2) assuming that it is a "state statute", whether it is state-wide or local in its application.

(1)

■ The three-judge court was devised as a procedural protection against "improvident state-wide doom by a federal court of a state's legislative policy", whether "such policy is defined in a state constitution or in an ordinary statute or through the delegated legislation of an 'administrative board or commission'". Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941). The word "statute", as used in 28 U.S.C. § 2281, is "a compendious summary of various enactments, by whatever method they may be adopted, to which a State gives her sanction * * *"; it includes a state constitution. American Federation of Labor v. Watson, 327 U.S. 582, 592–93, 66 S.Ct. 761, 766, 90 L.Ed. 873 (1946). Even before the amendment adding the words "or of an order made by an administrative board or commission acting under" a statute, it had been held that "statute" included administrative orders. Okla-

2. Judge Fairchild dissents from this conclusion and is of the opinion that this resolution is not a "state statute" under 28 U.S.C. § 2281, and that an application for injunction against enforcement of such resolution on the ground of the unconstitutionality of such resolution need not be heard by a court of three judges. Judge Fairchild agrees with dismissal and the reasons stated therefor if a three-judge court be appropriate.

homa Natural Gas Co. v. Russell, 261 U. S. 290, 292, 43 S.Ct. 353, 67 L.Ed. 659 (1923); Louisville & Nashville R. R. Co. v. Garrett, 231 U.S. 298, 301, 318, 34 S. Ct. 48, 58 L.Ed. 229 (1913).

In Liveright v. Joint Committee of the General Assembly of State of Tennessee, 279 F.Supp. 205 (M.D.Tenn., 1968), it was held that a suit for injunctive relief against investigation by a state legislative committee operating under the authority of a joint resolution was appropriately to be determined by a single federal judge. The court observed that the language quoted from *Watson*, supra, "would imply that a joint resolution may be within the meaning of 'statute'". 279 F.Supp. at 212. However, that question was not decided; the court assumed that the resolution was a "statute", but held that it did not have statewide application.

In Stamler v. Willis, 371 F.2d 413 (7th Cir., 1966), a three-judge court was convened, pursuant to 28 U.S.C. § 2282, to consider an action for injunctive relief based upon an attack on the constitutionality of a resolution of the House of Representatives. Necessary to that decision was a holding that House Rule XI was an "Act of Congress" within the meaning of § 2282. Krebs v. Ashbrook, 275 F.Supp. 111 (D.C.D.C., 1967), is to the contrary. The court explicitly held that House Rule XI was not an "Act of Congress" within the meaning of 28 U. S.C. § 2282. That three-judge court, divided on the question, dissolved itself. However, the majority stated, 275 F. Supp. at 118:

> "True it is that as a matter of policy when an injunction is sought there would seem to be good reason for a three-judge court to pass on a constitutional challenge to the authority of a congressional committee."

■ The reasons for the enactment of 28 U.S.C. § 2281 as described in Phillips v. United States, supra, and in Swift & Co. v. Wickham, 382 U.S. 111, 116, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), are especially relevant to the instant case. If our system is intent upon protecting state legislatures from improper intrusion by federal courts, then the protective procedural device of the three-judge court "to allow a more authoritative determination and less opportunity for individual predilection in sensitive and politically emotional areas", Swift & Co. v. Wickham, supra, at 119, 86 S.Ct. at 263, should be invoked here. The Resolution here challenged is clearly an enactment "to which a State gives her sanction". American Federation of Labor v. Watson, supra, 327 U.S. at 592–593, 66 S.Ct. at 766. If the authority delegated to a state administrative agency is to be protected by three judges, then so must the authority delegated to a legislative committee. We conclude the Resolution is a "state statute" for purposes of 28 U.S.C. § 2281.

(2)

■ The second question is whether the Resolution is state-wide or local in its application. It is well established that a three-judge court is appropriate to consider the constitutionality only of statutes having state-wide application. Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 1548, 18 L.Ed.2d 643 (1967). "The term 'statute' in § 2281 does not encompass local ordinances or resolutions." Id. In *Moody* the court held that a three-judge court had been improperly convened since the complaint attacked the constitutionality of a state statute dealing with apportionment and districting for the governing board of only one county.

The Resolution here refers to "the riotous situation occuring on the campus during the week of October 16th". The "campus" referred to is clearly the Madison campus of the University of Wisconsin. The Resolution authorizes the Committee to investigate "the riotous and unlawful activities of the week of October 16th and any prior or further such activities and the possible involvement of the WEB DuBois Club and Students for a Democratic Society in such activity. * * *"

We take judicial notice that the University of Wisconsin is supported by the taxpayers of the entire State of Wisconsin; that it includes campuses in several communities in the state, a "center system" in several other communities in the state, and an "extension" division with headquarters on the Madison campus; that the Madison campus is the principal and largest campus; that in 1967–1968 there were some 33,000 students enrolled on the Madison campus, drawn from all parts of Wisconsin, the United States, and the world; that its alumni reside throughout the state, the United States, and the world; and that the Madison campus includes several schools and functions, such as graduate schools of law and medicine, not found at other campuses of the University.

Even if we were to construe the Resolution as limited to the Madison campus, we would be obliged to hold that it does not deal "solely with matters of local concern", but is of "general and state-wide application". Moody v. Flowers, supra, at 101, 103, 87 S.Ct. at 1548. But the Resolution cannot reasonably be construed as so limited, since it reaches to any "prior or further such activities", presumably student demonstrations considered to be "riotous and unlawful". In oral argument counsel for defendants, who also serves as special counsel for the Committee in its work, was unable to represent that the Resolution excluded investigation of activities at other campuses of the University. We conclude that the Resolution is of general and state-wide application, and that this action is appropriately to be heard and determined by a three-judge court.

## THE CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

Defendants contend that the complaint states no basis for either injunctive or declaratory relief because: it does not show that the plaintiffs have no plain, speedy, or adequate remedy at law; there is no substantial controversy between the parties of sufficient immediacy to warrant the issuance of a declaratory judgment; no facts are alleged showing a relative certainty that coercive litigation will eventually ensue between the parties if a declaration is refused; the complaint alleges no more than a possibility that at some future time plaintiffs may be adversely affected by acts of government officials; a proceeding against the plaintiffs for contempt under Wis.Stats. §§ 13.26 and 13.27 may not be instituted by the Committee, but only by the Senate as a whole; and even if the Senate did initiate such a proceeding, the ensuing controversy would not be between the plaintiffs and the defendants, but between the plaintiffs and the Senate.

A substantial controversy between the plaintiffs and these defendants is clearly present. It is at the time of the Committee's questioning that the necessity arises to decide whether to disclose information which may be shielded by the First Amendment or to refuse to answer and risk punishment for contempt. It is realistic for a witness to assume that a refusal will result in a citation for contempt. That it is the Senate as a whole which must ultimately render the citation, rather than the Committee itself, is not decisive. If, under the threat of contempt, the witness elects to testify, and if in truth it is testimony which may not constitutionally be compelled, the invasion of his First Amendment rights occurs when the question is put to him by the Committee. Remedy at law is inadequate if his First Amendment rights have indeed been invaded.

"[The witness] must decide at the time the questions are propounded whether or not to answer. As the Court said in Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692, the witness acts at his peril." Watkins v. United States, 354 U.S. 178, 208, 77 S.Ct. 1173, 1190, 1 L. Ed.2d 1273 (1957).

If the plaintiffs were to establish the facts alleged in their complaint, and if their legal contentions were to be sus-

tained, declaratory relief would be appropriate and, except for the considerations developed in the following section of this opinion, injunctive relief would be appropriate.

## THE VALIDITY OF THE RESOLUTION AS WRITTEN AND AS APPLIED

Article X, Section 6 of the Wisconsin Constitution declares that "provision shall be made by law for the establishment of a state university". Section 36.01, Wis.Stat., provides: "There is established * * * an institution of learning by the name and style of 'The University of Wisconsin'." Chapter 36 of the Wisconsin Statutes contains many provisions dealing with the organization and functions of the University.

 So far as the distribution of powers among the branches of the state government of Wisconsin is concerned, and so far as appropriateness as a subject of inquiry is concerned, a house of the Wisconsin legislature is clearly empowered to investigate events occurring on the campuses of the University of Wisconsin, involving the maintenance of order there and the performance of University functions.

"The legislature has very broad discretionary power to investigate any subject respecting which it may desire information in aid of the proper discharge of its function to make or unmake written laws, or perform any other act delegated to it by the fundamental law, state or national, and to proceed, with that end in view, by a duly authorized committee of one or both branches of the Legislature and to incur reasonably necessary expenses, payable out of the public funds." State ex rel. Rosenhein v. Frear, 138 Wis. 173, 176–177, 119 N.W. 894, 895 (1909).

With respect to Congress, it has been held:

"The power * * * to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." Watkins v. United States, 354 U.S. 178, 187, 77 S.Ct. 1173, 1179 (1957).

This statement with respect to the investigatory power of Congress has been said to be equally applicable to state legislatures. Gibson v. Florida Legislative Investigation Committee. 372 U.S. 539, 544–545, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963).

 With respect to the present case, there are to be considered two limitations imposed by the Constitution of the United States upon the investigatory powers of state legislatures. The first is a concept of due process under the Fourteenth Amendment: whether the subject matter of the particular legislative investigation is defined with sufficient explicitness and clarity to provide a reasonable basis for judgment by the witness whether a specific question put to him is pertinent to that subject matter. The second is a First Amendment concept, as embodied in the Fourteenth: if the legislative inquiry invades those freedoms of opinion and speech and association protected by the First Amendment, whether there is a substantial relationship between the information sought and some subordinating, overriding, compelling state interest or concern.

### (1) Due Process

Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), involved a conviction under 2 U.S.C. § 192, which makes it a misdemeanor for a witness summoned by a Congressional committee to refuse to answer any question "pertinent to the question under inquiry". It was held that as a condition precedent to a conviction under this criminal statute, the "question under inquiry" must have been defined with sufficient explicitness and clarity to afford the witness a reasonable basis

for judgment whether a particular question put to him was pertinent to the "question under inquiry". The court concluded from the record that the "question under inquiry" had not been defined with sufficient explicitness and clarity, that a violation of due process had resulted, and that the indictment should be dismissed.

 The Wisconsin statutes (secs. 13.26, 13.27, 13.31, 13.32, 13.34 and 13.-35) contain no express provision that punishment for contempt may be visited upon a witness only if the question which he refuses to answer is pertinent to the question under inquiry. However, this requirement must be implied to save the contempt statutes from unconstitutionality; it would violate due process to punish for contempt a witness who has declined to answer a question which is clearly far beyond the scope of the authorized investigation. We hold that this requirement is implied by the Wisconsin statutes governing contempt of the legislature.

The threshold inquiry then is whether the Resolution here challenged does define with sufficient explicitness and clarity the question under inquiry.

The language of Substitute Amendment 1, while a vast improvement upon Resolution 13 as originally offered, is not a model of explicitness or clarity. There is evidence that it was drafted in haste. Journal of the Senate, October 20, 1967, pp. 1501–1502. "* * * [A]ny activities occurring on the campus which violate the laws and/or policies of the State of Wisconsin * * *", "* * * such riotous and unlawful conduct * * *", "* * * the riotous and unlawful activities of the week of October 16th and any prior or further such activities" are far from precise terms. Little light is shed by the assertion that the "situation * * * appears prima facie to violate": (a) "such law", which is not elsewhere specified; and (b) "such * * * policy", which apparently refers to employment interviews on the campus.

In *Watkins* it was said (354 U.S. at 208–209, 77 S.Ct. at 1190):

"It is obvious that a person compelled to make this choice [whether or not to answer] is entitled to have knowledge of the subject to which the interrogation is deemed pertinent. That knowledge must be available with the same degree of explicitness and clarity that the Due Process Clause requires in the expression of any element of a criminal offense. The 'vice of vagueness' must be avoided here as in all other crimes."

It would obviously have made the judicial task far easier had the Senate in its resolution declared with reasonable particularity that one of the subjects of inquiry was the widely publicized October 18 demonstration in and near the Commerce Building on the Madison campus of the University, in protest against the holding of employment interviews by Dow Chemical Company. Such language might have been coupled with other and perhaps broader issues to which certain witnesses, such as officers of the University, might reasonably have been expected to respond voluntarily. But with respect to involuntary appearances and compelled testimony and the underlying threat of contempt proceedings, such reasonable particularity in the language of the Resolution would have diminished or avoided the ensuing difficulty.

The record herein includes a transcript of the examination of the witness Goldman by committee counsel on November 9. After considerable preliminary difficulties, the witness expressed his willingness to answer only those questions of the Committee that might pertain to his conduct and activities and not those that might pertain to the conduct and activities of others. Thereupon, he was asked about his conduct on the Madison campus of the University on October 18, 1967, immediately preceding and during the demonstration in and near the Commerce Building. He was asked in which college in the University he was enrolled and whether he had elected a major field of study. He was

asked to which student organizations he belonged. When he responded that he was a member of Students for a Democratic Society, he was asked whether he was an officer. When he responded that he was the chairman or president or spokesman on October 18, he was asked whether the Society had participated in "the whole matter of the protest and the expression of opposition to the Dow interviews on the campus, the one that took place on October 18th on the campus and that centered around and involved both the interior and the area around immediately adjoining the Commerce Building" (Tr. 71), whether an understanding had been reached among the members of the Society with respect to such participation, and whether members of the Society as individuals had participated.

It is true that the questioning of plaintiff Goldman on November 9 may have been kept within reasonably narrow limits only because of his insistence that he would respond to questions limited to his individual conduct and activities; there was no indication by the committee or its counsel whether subsequent questioning would be so limited. It is also true that in oral argument to this court, counsel for the committee was not disposed to concede that the questions to be put to the plaintiffs in subsequent interrogation would be limited to the subject matter upon which plaintiff Goldman was questioned November 9.

However, upon careful evaluation of the record before us and upon consideration of the factual setting in which the investigation was authorized, we conclude that the primary subject of the investigation authorized by the Resolution was sufficiently well understood by all concerned; it was the October 18 demonstration in and near the Commerce Building of the Madison campus, with respect to the Dow Chemical Company interviews. With respect to these plaintiffs, the inquiry to date has not ranged beyond this well understood primary subject. We conclude, however, that the

Resolution is peripherally vague. In point (3) below, we consider what judicial response to this vagueness may be appropriate.

(2) The First Amendment

"Clearly, an investigation is subject to the command that the Congress shall make no law abridging freedom of speech or press or assembly * * *. [An investigation] is justified solely as an adjunct to the legislative process. The First Amendment may be invoked against infringement of the protected freedoms by law or by lawmaking." Watkins, supra, 354 U.S. at 197, 77 S.Ct. at 1184.

█ These First Amendment limitations upon "lawmaking" investigations apply equally to state legislatures by reason of the Fourteenth Amendment. N. A. A. C. P. v. State of Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 544, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963).

█ The freedoms guaranteed by the First Amendment include the right of association:

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. * * * It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." N. A. A. C. P. v. State of Alabama ex rel. Patterson, 357 U.S. at 460, 78 S. Ct. at 1171.

█ Privacy in association is, in turn, an essential element of the right of association:

"* * * [C]ompelled disclosure of affiliation with groups engaged in advo-

cacy may constitute * * * effective * * * restraint on freedom of association * * *. This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. * * * Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." N. A. A. C. P. v. State of Alabama ex rel. Patterson, 357 U.S. at 462, 78 S.Ct. at 1172.

The Resolution here directs the committee to gather facts with respect to "the possible involvement of the WEB DuBois Club and Students for a Democratic Society" in "the riotous and unlawful activities of the week of October 16th and any prior or further such activities. * * *" As written, the Resolution is broad enough to permit questioning concerning the identity of the members of these two organizations. Plaintiffs contend, therefore, that the Resolution is overly broad, "that it sweeps within its broad scope activities that are constitutionally protected * * *." Cox v. State of Louisiana, 379 U.S. 536, 552, 85 S.Ct. 453, 463, 13 L.Ed.2d 471 (1965), and that it is unconstitutional as written.

It has been held that to permit invasion of First Amendment freedoms by legislative inquiry, there must be a substantial connection or "nexus" between the information sought, on the one hand, and, on the other, a subject of subordinating, overriding, and compelling state interest. Gibson, 372 U.S. at 546, 83 S.Ct. 889; Bates v. City of Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960).

We will refer to the subject of the October 18 demonstration, including its historical roots and its implications for the future, as the "primary subject". We will refer to the identity of the membership of Students for a Democratic Society or the W.E.B. DuBois Club as a "secondary subject". The initial question relates to the presence or absence of a substantial nexus between the primary and secondary subjects. If we determine that such a nexus has been established by the record presented here, we would be called upon to consider whether the state's interest in the primary subject is so subordinating, overriding, and compelling as to permit invasion of the secondary subject.

We have already concluded that the state has a legitimate interest in the primary subject, the October 18 demonstration. It has been recognized that legislative inquiries must sometimes "proceed step by step". Barenblatt v. United States, 360 U.S. 109, 130, 79 S. Ct. 1081, 3 L.Ed.2d 1115 (1959). It is reasonable that the state's interest in the primary subject would justify inquiry by the legislature into the identity of the individuals—and the organizations, if any—which may have planned the demonstration or participated in it. Thus it appears proper to inquire of a specific witness whether he planned or participated in the October 18 demonstration, and whether an organization of which he was a member or an officer planned or participated in the demonstration. If the answers are affirmative, the nexus between the primary subject (the demonstration) and the secondary subject (the identity of the members of the planning or participating organization) may have been established, assuming that the testimony is considered credible. The question then would arise whether another step could be taken. Whether disclosure of the identity of the members of the planning or participating organization might then be compelled would depend upon whether the state's interest in the primary subject is so subordinating, overriding, and compelling as to justify the invasion of constitutionally protected privacy of association. It would then be necessary to evaluate the quality and intensity of the state's interest in the primary subject, in the context of the entire record developed to that point by the legislative inquiry.

With respect to these plaintiffs, the record presented to us discloses no legislative inquiry beyond that reasonably calculated to determine whether there is a nexus between the primary subject, the demonstration, and a secondary subject, Students for a Democratic Society. We do not believe that the inquiry to date has exceeded permissible bounds. Because the future course of the investigation, if any, is uncertain, however, and because special counsel for the Committee was not reassuring in his representations to this court in oral argument with respect to possible future lines of inquiry, it may be useful to observe: (1) that the required nexus between the primary subject, on the one hand, and Students for a Democratic Society or the W.E.B. DuBois Club, on the other, has clearly not as yet been established in the record presented to this court; and (2) that the record thus far presented to this court is insufficient to establish that the interest of the state in the primary subject is so subordinating, compelling, and overriding as to justify invasion of constitutionally protected privacy of association.

Clearly, there has been no showing in the record thus far presented to this court that either Students for a Democratic Society or the W.E.B. DuBois Club is itself a primary subject of legitimate state interest sufficient to support inquiry into the identity of their membership and into their internal affairs; that is to say, there has been no showing here comparable to that which has caused the Supreme Court of the United States to refuse "to view the Communist Party as an ordinary political party" and to recognize "the close nexus between the Communist Party and violent overthrow of government." Barenblatt v. United States, 360 U.S. at 128, 79 S. Ct. at 1094. Senate Resolution 13, as originally offered February 23, 1967, contains some references to statements by the Director of the Federal Bureau of Investigation and by one "Hall", but the references are garbled and indistinct and appear to have gained understanding and approval from no one but the author of the Resolution.

(3) Appropriate judicial response

We have concluded that the Resolution as written is vague, but that with respect to these plaintiffs the investigation pursuant to the Resolution has been confined thus far to a well understood subject matter and has not reached the vague periphery. We have also concluded that the Resolution as written may be overly broad because it would permit invasion of constitutionally protected privacy of association, but that with respect to these plaintiffs the investigation pursuant to the Resolution has not invaded thus far constitutionally protected privacy of association.

It is contended by the plaintiffs that declaratory or injunctive relief, or both, should be granted now because the very existence and presence of the vague and overly broad Resolution of October 20, 1967, as written, produces a chilling effect upon the exercise of First Amendment freedoms by the plaintiffs and by others not yet subpoenaed by the Committee and not parties to this action. With respect to actual or threatened prosecutions under criminal statutes, there is authority for this contention. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); and Cameron v. Johnson, 381 U.S. 741, 85 S.Ct. 1751, 14 L.Ed.2d 715 (1965) and 390 U. S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182, decided April 22, 1968. In evaluating the inhibitory effect of criminal statutes alleged, not frivolously, to invade First Amendment freedoms, "this Court has not hesitated to take into account possible applications of the statute in other factual contexts beyond that at bar." N. A. A. C. P. v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Even those whose First Amendment rights have not been invaded nor threatened with direct invasion by enforcement of a criminal statute enjoy standing to adjudicate the issue of the

statute's asserted overbreadth. Heckler v. Shepard, 243 F.Supp. 841, 844 (E.D. Idaho, 1965) (three judge court), citing Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); and Dombrowski v. Pfister, supra.

We are called upon to determine whether the timing of judicial intervention, the rules of standing, and the methods of constitutional analysis appropriate to challenges to criminal statutes are equally appropriate to a challenge to a legislative resolution, as written, authorizing an investigation by a legislative committee.

As noted above, in *Watkins* it was said, 354 U.S. at 209, 77 S.Ct. at 1190, that knowledge of the subject to which interrogation is deemed pertinent: "must be available [to the witness] with the same degree of explicitness and clarity that the Due Process clause requires in the expression of any element of a criminal offense. The 'vice of vagueness' must be avoided here as in all other crimes." *Watkins* involved review of a conviction for contempt of Congress; the interrogation had occurred; the witness had refused to respond; the record of the legislative investigation had been made and was available for judicial scrutiny; and the prosecution had been carried through to conviction. The court was not confined to a judicial analysis of the authorizing resolution, as written. Also *Watkins* suggested in dictum that knowledge of pertinency to "the question under inquiry", in the case of a legislative inquiry, may be made available to the witness by means other than the language of the authorizing resolution alone. 354 U.S. at 209, 77 S. Ct. 1173. (Although *Watkins* suggests that the "rules against vagueness" may be satisfied by such other means, it does not reach "rules against overbreadth", as distinguished from vagueness.)

In Barenblatt v. United States, 360 U.S. 109, at 130, 79 S.Ct. 1081, at 1095, 3 L.Ed.2d 1115 (1959), decided two years after *Watkins*, it was held: "The strict requirements of a prosecution under the Smith Act [18 U.S.C. § 2385], see Dennis v. United States, [341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)], and Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356, are not the measure of the permissible scope of a congressional investigation into 'overthrow,' for of necessity the investigatory process must proceed step by step." Thus, although one may not be convicted as a criminal for advocacy and teaching of forcible overthrow of the government as an abstract principle, *Yates*, supra, 354 U.S. at 318, 77 S.Ct. 1064, a legislative investigation "* * * of advocacy of or preparation for overthrow certainly embraces the right to identify a witness as a member of the Communist Party * * * and to inquire into the various manifestations of the Party's tenets." 360 U.S. at 130, 79 S. Ct. at 1095.

Historically, it is clear that both declaratory and injunctive relief have been withheld with respect to legislative investigations. See Note, The Application of the Fourth Amendment to Congressional Investigations, 52 Minnesota L.Rev. 665, 671–672, nn. 34, 35 (1968). It appears that judicial reluctance to provide such relief is abating. Jordan v. Hutcheson, 323 F.2d 597 (4th Cir., 1963); Liveright v. Joint Committee of the General Assembly of State of Tennessee, 279 F.Supp. 205 (Md.Tenn., 1968). It is unnecessary presently to determine definitely the circumstances in which such judicial intervention is appropriate. For the purpose of the present action, it is enough to observe that the very process of legislative investigation must often be tentative and uncertain. It is not reasonable to require the legislature, even before its investigatory function has been commenced, to define the subject or subjects of investigation with that degree of specificity and clarity which must mark its ultimate articulation of a criminal prohibition. In its investigative function, the

legislature must enjoy more leeway. We have concluded that it is the better course to examine the Resolution, not simply as written, but as applied or as threatened to be applied.

We hold that the Resolution has not been applied unconstitutionally as yet, and that the threat of unconstitutional application is insufficiently imminent, on the present record, to warrant intervention. With respect to violation of due process by reason of vagueness, the Committee has not undertaken as yet to compel testimony in the areas of peripheral vagueness. With respect to a violation of the First Amendment guarantees by reason of overbreadth, it is necessary to await the development or absence of development of a nexus between the subject of the October 18 demonstration, on the one hand, and either of the two named organizations, on the other. Assuming that such a nexus is established of record, it is necessary further to await the development of a record by which it can be determined whether the state's interest in the October 18 demonstration is sufficiently subordinating, compelling, and overriding to permit compelled testimony with respect to the identity of the members of either organization or the internal affairs of either organization.

We have concluded to withhold both declaratory and injunctive relief at this time and to dismiss this action. Whether these plaintiffs or others similarly situated may be entitled to such relief at a later stage of the investigation, if such a stage is reached, will depend upon the record by then developed.

This action is hereby dismissed.

### APPENDIX

Senate Resolution 13, as introduced on February 23, 1967:

"Relating to the W.E.B. Du Bois Club and the Students for a Democratic Society.

"Whereas, there has been a great deal of bad front page publicity about our great University; and

"Whereas, much of this is caused by the influence of leftist organizations such as the Students for a Democratic Society and the W.E.B. Du Bois Club. J. Edgar Hoover, Director of the F.B.I., in his October 1966 and February 1967 F.B.I. Law Enforcement Bulletin cited the W.E.B. Du Bois Clubs of America and their comrades in the Students for a Democratic Society, a so called 'New-Left' group, working hand in hand with the Du Bois Club on the campus are organizations such as the Students for a Democratic Society, a militant youth group which receives support from the Communist Party and which in turn supports Communistic objectives and tactics. Hall has characterized it, along with the Du Bois Club, as a group which the Communistic Party has 'going for us'; now, therefore, be it

"Resolved by the senate, That the Wisconsin Senate go on record this Thursday, February 23, 1967, as encouraging Honorable President Fred Harrington and the Board of Regents to abolish the W.E.B. Du Bois Club and the Students for a Democratic Society from the campus of the University of Wisconsin; and, be it further

"Resolved, That the President and the Board of Regents request that the University newspaper, The Daily Cardinal, set a better image of the University of Wisconsin and better protect the good name of the University of Wisconsin."

Substitute Amendment 1 to Senate Resolution 13, as introduced and adopted on October 20, 1967:

"Whereas, the University of Wisconsin is an institution established by the people of the State of Wisconsin, for their use and benefit, and

"Whereas, it is the policy of the State of Wisconsin to encourage all persons to use the facilities of the University for all lawful purposes, in-

cluding the right to interview and recruit for any lawful employment, and

"Whereas, the Wisconsin State Senate has a right and obligation to inform itself and the people of the State of Wisconsin as to any activities occurring on the campus which violate the laws and/or policies of the State of Wisconsin, and

"Whereas, the riotous situation occuring on the campus during the week of October 16th appears prima facie to violate such law and policy, and

"Whereas, student leaders of such riotous and unlawful conduct appear further to be leaders in the WEB DuBois Club and the Students for a Democratic Society.

"Now, therefore, be it resolved by the Senate that a select Senate committee consisting of six members of the Senate appointed as are standing committees with equal representation from each party and the Lieutenant Governor as chairman of such committee, is hereby created for the purpose of gathering the facts with respect to the riotous and unlawful activities of the week of October 16th and any prior or further such activities and the possible involvement of the WEB DuBois Club and Students for a Democratic Society in such activity, and is to prepare a report with respect to the facts and the committee's conclusions with respect to such activities; and the committee is to inform the University administration and faculty with respect to the laws and policies of this state and encourage said administration and faculty to vigorously enforce such laws and policies; and the committee is to report its findings and recommendations to the Senate at the earliest possible time, but in any event, shall provide the Senate with a status report no later than October 27, 1967."